

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| | § | No. 08-11-00232-CR |
| | § | |
| EX PARTE: | § | Appeal from |
| | § | |
| MARIO ALBERTO GARCIA | § | 409th District Court |
| | § | of El Paso County, Texas |
| | § | (TC # 20090D00264) |
| | § | |

## **O P I N I O N**

Mario Alberto Garcia appeals from the trial court's order denying his first amended writ of habeas corpus. In 2009, pursuant to a plea agreement, Appellant pled guilty to two counts of aggravated assault with a deadly weapon, to wit: a knife. The trial court accepted his plea and, in accordance with the State's recommendation, sentenced him to eight years' deferred adjudication and placed him on community supervision. Appellant did not appeal the decision.

In November 2010, Appellant filed a writ of habeas corpus pursuant to Texas Code of Criminal Procedure article 11.072 in which he alleged that his trial counsel rendered ineffective assistance. The trial court denied habeas relief. Appellant later filed a motion requesting the court to vacate the order denying relief. That same day, Appellant also filed a first amended application. The court granted the motion to vacate and ordered an evidentiary hearing to be

held on the first amended application. After the hearing, the trial court denied relief and filed findings of fact and conclusions of law consistent with its decision. This appeal follows.

In five issues, Appellant argues that the trial court erred because the evidence proved that he was actually innocent of both counts of aggravated assault and that he was denied effective assistance of counsel at the plea hearing.

## FACTUAL SUMMARY

On December 22, 2008, Officer Almanza of the El Paso Police Department was dispatched (along with two other officers) to Appellant's home in response to an alleged family violence aggravated assault. Once on the scene, Officer Almanza spoke with Lizeth Molina,[1] Appellant's wife. According to the incident report, Molina told Officer Almanza that Appellant had threatened her with a knife. She was feeding their one-month-old infant in the living room when Appellant arrived home in a drunken state and told her to give him the baby. Lizeth refused. Appellant then grabbed the baby and took it upstairs. Lizeth followed him and Appellant turned around to spit at her. Once upstairs, Lizeth was able to retrieve the baby and returned downstairs to finish the feeding. Appellant then came back downstairs, went into the kitchen, came into the living room, grabbed the baby, and headed back upstairs. Lizeth followed him. Once upstairs, Appellant laid the baby on the bed and the couple began to argue. Lizeth told Officer Almanza that Appellant said he had a knife and "was in a fighting stance facing [her] with his right hand behind his back." Lizeth's father heard the argument and came upstairs,

---

[1] There is a discrepancy in the record with respect to the spelling of Appellant's wife Ms. Molina's first name. According to her own affidavit, Ms. Molina spells her first name with a "z" -- "Lizeth." [Emphasis added]. Appellant's applications for writ of habeas corpus also spell "Lizeth" with a "z." However, the reporter's record refers to the same person as "Liseth Molina." [Emphasis added]. In other words, the reporter's record uses an "s" in place of the "z" in spelling Ms. Molina's first name. Presumably, Ms. Molina correctly spelled her own name in her affidavit, and the reporter's record contains an erroneous spelling. (This presumption is also supported by the fact that, at the hearing, Ms. Molina was only asked to spell her last name for the record. However, regardless of which spelling is in fact correct, we note that for purposes of this opinion, any reference to either "Lizeth" or "Liseth," is a reference to the same person--Ms. Molina, Appellant's wife.

asking Appellant what he was doing and telling him not to hurt Lizeth. Appellant told his father-in-law that it was not his problem and then lunged at him with the knife. When Lizeth grabbed Appellant by the shirt, he dropped the knife and fled the scene. Officer Almanza's report states that Lizeth told him she feared for her life, the life of her children, and the life of her father.

The incident report also details Officer Almanza's conversation with Lizeth's father, Fernando Molina. He came out of his room because he heard arguing. He witnessed Appellant leave the kitchen, grab the baby, and head upstairs. When the argument continued, Fernando ran upstairs. He saw Appellant in a fighting stance, facing his daughter, with a knife in his right hand. He asked Appellant what he was doing and told him not to hurt his daughter. Appellant responded that it was none of his business and then lunged at him with the knife. When Lizeth grabbed Appellant by the shirt, he dropped the knife and fled. According to Officer Almanza's report, Fernando "stated that he did fear for his life and the life of his grandchildren and [his daughter].

**THE WRIT APPLICATION AND THE HEARING**

In his amended application, Appellant alleged that he was actually innocent of both counts of aggravated assault and that he had received ineffective assistance from his trial counsel, Jeff Rago. Appellant attached his own affidavit to the writ application as well as affidavits by Lizeth and Fernando Molina. The State filed a response along with a transcript of the plea proceedings, a copy of the original police report, an affidavit from Rago, and various guilty plea papers. Officer Victor Almanza, Appellant, and Lizeth testified at the hearing. A transcript of the 911 call Lizeth made on the night of the incident was admitted into evidence. The trial court denied habeas relief and filed findings of facts and conclusions of law:

<u>FINDINGS OF FACT</u>

1. On 20 January 2009, Mario Alberto Garcia was indicted for two counts of

- 3 -

aggravated assault with a deadly weapon.

2. The case was assigned to the 409th District Court, El Paso County, Texas.

3. On 23 April 2009, pursuant to a plea agreement, Garcia pleaded guilty.

4. In accordance with his plea agreement, the trial court deferred entry of a judgment and placed Garcia on eight-years deferred adjudication.

5. In the trial court, Garcia was represented by Attorney Jeff Rago.

6. Garcia did not file an appeal in cause number 20090D00264.

7. On 8 November 2010, Garcia filed his application for a writ of habeas corpus under article 11.072, Texas Code of Criminal Procedure.

*Ineffective assistance of counsel*

8. Garcia advised Attorney Rago that he was not a U.S. citizen.

9. Attorney Rago discussed with Garcia the paperwork for the proposed guilty plea.

10. Attorney Rago advised Garcia that a plea of guilty to the charged offenses could result in his deportation, exclusion from admission to the U.S., and denial of naturalization.

11. Attorney Rago did not tell Garcia that he would not have any immigration problems if he pleaded guilty to the charged offenses.

12. Attorney Rago gave Garcia the opportunity to read each page of his plea agreement.

13. Attorney Rago explained each page of Garcia's plea agreement to him before he signed each page.

14. Garcia stated that he understood each page before he signed the page.

15. The plea paperwork signed by Garcia contained an admonishment of the immigration consequences of a guilty plea, to include possible deportation.

16. Attorney Rago confirmed with applicant that he understood the contents of the plea paperwork before applicant signed the plea agreement.

17. Garcia made the decision to plead guilty in lieu of a jury trial.

18. Garcia's assertion that Attorney Rago did not inform him that a guilty plea could result in his deportation, denial of naturalization and expulsion from the

United States is not credible.

19. Attorney Rago's professional assistance pre-dated the Supreme Court decision in *Padilla v. Kentucky*.

20. Attorney Rago's accounting of his representation of Garcia is credible.

<em>Voluntariness of guilty plea</em>

21. On 23 April 2010, this Court conducted a plea hearing in Garcia's case.

22. Garcia did not request an interpreter or in any manner indicate that he did not understand the guilty-plea proceedings.

23. Garcia admitted under oath that he was aware of the charged offenses and applicable punishment range.

24. Garcia stated that he understood the rights he would be giving up by a plea of guilty.

25. Garcia declared that he had read and understood the plea-agreement paperwork before he signed it.

26. Attorney Rago explained the plea papers to Garcia.

27. Garcia made no assertion that he did not read or understand the admonishment in his plea papers advising him of the immigration consequences of his guilty plea.

28. Garcia stated that he was satisfied with attorney Rago's representation.

29. Garcia informed the Court that he was not a U.S. citizen.

30. The Court informed Garcia that pleas of guilty to the charged offenses could result in his deportation, his exclusion from the United States, or denial of naturalization.

31. After being advised of the consequences of his proposed pleas of guilty, Garcia persisted in his desire to plead guilty.

32. Garcia stated that he had not been threatened, coerced, or promised anything to plead guilty.

33. Garcia stated that he was pleading guilty freely and voluntarily because he was guilty and for no other reason.

34. Garcia was admonished of the consequences of his guilty plea in accordance

with article 26.13(a) of the Texas Code of Criminal Procedure.

35. Garcia's assertion that he did not understand the immigration consequences of his plea, to include possible deportation, is not credible.

### *Justification Defense*

36. On 22 December 2007, Liseth Molina called 911 to report that her husband, Mario Garcia, was 'bothering her.'

37. El Paso Police Officer Almanza responded to the 9-1-1 call.

38. Liseth Molina told Officer Almanza that Garcia had threatened her with a knife and that she feared for her life.

39. Fernando Molina told Officer Almanza that Garcia had threatened him with a knife and that he feared for his life.

40. The statements of Liseth Molina and Fernando Molina to Officer Almanza are credible.

41. Garcia provoked the altercation that caused his wife, Liseth Molina, to call 911.

42. Garcia's actions directed toward his wife provoked Fernando Molina to seek to protect his daughter.

43. Fernando Molina reasonably believed that his intervention was immediately necessary to protect his daughter.

44. Neither Liseth Molina nor Fernando Molina possessed a deadly weapon or threatened Garcia with the use of deadly force.

45. Liseth Molina's assertion that Garcia did not threaten her with a knife is not credible.

46. Fernando Molina's assertion that he provoked Garcia's exhibition of a knife by attacking Garcia is not credible.

47. Lizeth Molina's assertion that her father provoked Garcia's exhibition of a knife by attacking Garcia is not credible.

### CONCLUSIONS OF LAW

1. Mario Garcia has failed to allege facts which, if true, would entitle him to relief. *Ex Parte Maldonado*, 988 S.W.2d 114, 116 (Tex.Crim.App. 1985).

2. Garcia failed in his burden to prove that his counsel rendered ineffective

assistance of counsel. *Strickland v. Washington*, 466 U.S. 68 [sic], 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

3. Attorney Rago exercised professional diligence in advising Garcia that his proposed plea of guilty could result in his deportation, denial of admission to the United State, or denial of naturalization. *See Strickland v. Washington*, 466 U.S. at 687.

4. Attorney Rago's representation complied with the dictates of *Padilla v. Kentucky*. *See Padilla v. Kentucky*, 559 U.S.___, 130 S.Ct. 1473, 1486, 176 L.Ed.2d 284 (2010).

5. Garcia's plea papers contained admonishments regarding the immigration consequences of his proposed guilty plea in accordance with articles 26.13(a) Texas Code of Criminal Procedure.

6. Garcia has failed his burden of showing deficient performance by his trial counsel, in advising him of the immigration consequences of his guilty plea. *See Strickland v. Washington*, 466 U.S. at 687.

7. Garcia has failed his burden of showing that he was prejudiced as a result of any alleged deficient performance by his trial counsel. *See Thompson v. State*, 9 S.W.3d 808, 813 (Tex.Crim.App. 1999).

8. Garcia failed to establish his entitlement to threaten the use of force under section 9.04 of the Texas Penal Code. *See e.g, Smith v. State*, No. 04-95-00337-CR. 1997 WL 94151 (Tex.App.--San Antonio 5 March 1997, pet. ref'd)(not designated for publication).

9. Garcia's guilty plea was made knowingly and voluntarily. *See State v. Jimenez*, 987 S.W.2d at 888.

## STANDARD OF REVIEW

An applicant seeking relief by writ of habeas corpus must prove his claim by a preponderance of the evidence. *Ex parte De Los Reyes*, 350 S.W.3d 723, 728 (Tex.App.--El Paso 2011, pet. granted), *citing Ex parte Morrow*, 952 S.W.2d 530, 534 (Tex.Crim.App. 1997). The decision to grant or deny an application for writ of habeas corpus rests within the trial court's discretion. *Ex parte Ramirez*, No. 08-11-00073-CR, 2012 WL 3113140, at *2 (Tex.App.--El Paso Aug. 1, 2012, no pet. h.)(not designated for publication). We view the facts in the light most favorable to the trial court's ruling and, absent an abuse of discretion, uphold

- 7 -

that ruling. *Ex parte Wheeler*, 203 S.W.3d 317, 323 (Tex.Crim.App. 2006); *Kniatt v. State*, 206 S.W.3d 657, 664 (Tex.Crim.App. 2006); *Washington v. State*, 326 S.W.3d 701, 704 (Tex.App.--Houston [1st Dist.] 2010, no pet.); *Ex parte Ramirez*, 2012 WL 311340 at *2; *Ex parte Torres*, 08-10-00330-CR, 2012 WL 1431660 (Tex.App.--El Paso Apr. 25, 2012, no pet.)(not designated for publication). We afford almost total deference to the trial court's determination of the historical facts supported by the record, especially when those facts are based upon an evaluation of credibility and demeanor. *Ex parte Amezquita*, 223 S.W.3d 363, 367 (Tex.Crim.App. 2006); *Wheeler*, 203 S.W.3d at 325-26; *Washington*, 326 S.W.3d at 704; s*ee Ex parte Peterson*, 117 S.W.3d 804, 819 (Tex.Crim.App. 2003)(per curiam), *overruled on other grounds by Ex parte Lewis*, 219 S.W.3d 335 (Tex.Crim.App. 2007); *Ex parte Ramirez*, 2012 WL 311340 at *2; *Ex parte Torres*, 2012 WL 1431660, at * 2. We also defer to the trial court's implied factual findings that are supported by the record. *Wheeler*, 203 S.W.3d at 325-26; *Washington*, 326 S.W.3d at 704. And we afford the same deference to the trial judge's application of law to the facts, if the resolution of the ultimate questions turns on an evaluation of credibility and demeanor. *Ex parte Victorio*, No. 05-11-01008-CR, 2012 WL 286803, at *3 (Tex.App.--Dallas Feb. 1, 2012, pet. ref'd), *citing Ex parte Peterson*, 117 S.W.3d at 819. We will only reverse a trial court's decision if we find it is arbitrary, unreasonable, and made without reference to guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990)(op. on reh'g). We will affirm a trial court's ruling on a habeas petition if the ruling is correct based on any legal theory before the court, regardless of whether some of the reasons given by the court appear to be faulty. *Ex parte Ramirez*, 2012 WL 311340 at *2, *citing Ex parte Carpio-Cruz*, 08-10-00240-CR, 2011 WL 5460848, *3 (Tex.App.--El Paso Nov. 9, 2011, no pet.).

**ACTUAL INNOCENCE**

In Issues One and Two, Appellant complains that he is actually innocent of the aggravated assault charges. In his first issue, he maintains that newly discovered evidence proves he is actually innocent of the aggravated assault charge against his father-in-law because it establishes that he was justified in threatening the use of deadly force. And in his second issue, he contends that based on the same new evidence -- and for substantially the same reasons as stated in Issue One -- he affirmatively demonstrated that he is actually innocent of the aggravated assault charge against his wife. The State counters that this evidence is neither newly discovered nor newly available and that even if it were, it fails to demonstrate Appellant's innocence. At best, the State argues, the affidavits raised a credibility issue which the trial court properly resolved against Appellant.

*Applicable Law*

The Court of Criminal Appeals has held that "claims of actual innocence based upon newly discovered evidence are cognizable on post-conviction writs of habeas corpus." *Ex parte Brown*, 205 S.W.3d 538, 544 (Tex.Crim.App. 2006), *citing State ex rel. Holmes v. Third Court of Appeals*, 885 S.W.2d 389, 398 (Tex.Crim.App. 1994, *orig. proceeding*) and *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex.Crim.App. 1996). This is true regardless of whether the applicant pled guilty or had a jury trial; an applicant can bring an actual innocence claim based on newly discovered evidence in either situation." *Ex parte Brown*, 205 S.W.3d at 544, *citing Ex parte Tuley*, 109 S.W.3d 388, 393-96 (Tex.Crim.App. 2002).

Under Texas law there are two types of actual innocence claims: (1) a *Herrera* claim; and (2) a *Schlup* claim. *See Ex parte Franklin*, 72 S.W.3d 671, 675 (Tex.Crim.App. 2002), *citing Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) and *Herrera v.*

*Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). A *Herrera* claim is a "substantive claim in which applicant asserts his bare claim of innocence based solely on newly discovered evidence." *Ex parte Franklin*, 72 S.W.3d at 675. By contrast, a *Schlup* claim is a procedural claim in which actual innocence does not itself provide a basis for relief but is tied to a showing of constitutional error at trial. *Ex parte Franklin*, 72 S.W.3d at 675. An applicant's burden of proof is different based on which type of claim is asserted. *Id*. Appellant does not specify which path he follows, but under either analysis, his claim is without merit.

"Establishing a bare claim of actual innocence is a Herculean task." *Ex parte Brown*, 205 S.W.3d 538, 545 (Tex.Crim.App. 2006). The applicant must show by clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence. *Ex parte Tuley*, 109 S.W.3d 388, 392 (Tex.Crim.App. 2002); *see also State ex rel. Holmes v. Hon. Court of Appeals for Third District*, 885 S.W.2d 389, 399 (Tex.Crim.App. 1994)("To be entitled to relief, however, petitioner would at the very least be required to show that based on proffered newly discovered evidence and the entire record before the jury that convicted him, 'no rational trier of fact could find proof of guilt beyond a reasonable doubt.'"). "This showing must overcome the presumption that the conviction is valid and it must unquestionably establish applicant's innocence." *Ex parte Brown*, 205 S.W.3d at 545.

Not only must the habeas applicant make a truly persuasive showing of innocence, he must also prove that the evidence he relies upon is newly discovered or newly available. The term "newly discovered evidence" refers to evidence that was not known to the applicant at the time of trial and could not be known to him even with the exercise of due diligence. An applicant cannot rely upon evidence or facts that were available at the time of his trial, plea, or

post-trial motions, such as a motion for new trial. A claim of actual innocence is not an open window through which an applicant may climb in and out of the courthouse to relitigate the same claim before different judges at different times. Thus, habeas relief is not available to one who has already litigated his claim at trial, in post-trial motions, or on direct appeal.

### *"Newly Discovered Evidence?"*

As detailed in the factual background above, Lizeth and Fernando Molina provided statements to the police on the night of the incident. Both victims then attested by affidavit in direct conflict with their original statements to police. Lizeth's affidavit states, in relevant part:

> I am married to Mario Garcia, a defendant who pled guilty in cause number 20090D00264, to having committed an aggravated assault against me. I wish to state that my husband never threatened me with the knife he was accused of threatening me with on or about December 22, 2008, the date this incident occurred. As my husband states in his writ application, I did observe him grab a knife and exhibit it toward my father, Fernando Molina, ***after my father rushed him in an effort to attack him. My husband's reaction to my father's aggressive behavior was completely defensive in nature. His impulsive decision to grab a knife was not done with the intent to hurt my father, but to repel my father's attack.*** Once my husband displayed the kitchen knife, my father immediately backed away and left the living room of our apartment. My husband did not follow or chase my father, but simply dropped the knife and left the apartment. (This apartment is leased to my husband. My father, who was visiting, was not on the lease).

> It was apparent to me that my father was very angry toward my husband because of the disrespect my husband showed to me on this occasion. However, while my husband did not conduct himself as a gentleman, he never threatened me in any way or lead me to think that I was in any danger of being assaulted. But the fact that the argument was ugly was enough to convince my father to become aggressive because he did not like to see me talked to in this manner. Although I know my father meant well, he clearly did not have the right to initiate a fight with my husband in the living room of my husband's apartment.

> ***I wish to further add that the knife was not pointed at me at any time, even though I did see the knife when it was displayed by my husband. The knife was at all times directed in the direction of my father, Fernando Molina. I never had any fear that my husband would use the knife against me, as it was clear that he only wanted my husband to back off.***

[Emphasis added].

- 11 -

Fernando's affidavit recited a similar version of events, contradicting his original statement to

Officer Almanza:

> I was named as a complaining witness in a case styled *State of Texas v. Mario Garcia*, filed as cause number 20090D00264. The defendant in that case, Mario Garcia, is my son-in-law. I remember very well the incident which led to my son-in-law arrest and prosecution on two aggravated assault charges. If I recall, the incident occurred in late December of 2008. On that date, I was at my son-in-law's apartment when he and my daughter, Lizeth Molina, got into an ugly argument. They were yelling at each other and saying ugly things back and forth. My daughter was telling him to leave the apartment, but Mario refused to do so.

> ***At no point did I observe Mario, my son-in-law, threaten my daughter with physical injury.*** Nor did he engage in any conduct which lead me to believe that he intended to injure her. However, I became very upset by the disrespectful manner in which he was talking to my daughter. Even though Mario told me that their argument was none of my business, ***I lost my temper and decided that I was going to teach Mario some respect by punching him with my fists.***

> ***I took off my sweater and began to rush him without warning. However, Mario anticipated the attack and grabbed a kitchen knife, which he exhibited for me to see.*** I did not know if Mario would stab me or not, but when I saw the knife I immediately backed off because I did not want to be stabbed. Mario made no attempt to chase me as I retreated into a bedroom. When I later exited the bedroom, I noticed that he had dropped the knife where he had been standing and that he had left the apartment without incident.

> ***I wish to further state that Mario's decision to grab the knife was an instantaneous decision which resulted only when he realized that I was going to attack him. I feel that he was justified in grabbing the knife because I gave him no warning about what I was going to do.*** Normally, I would never do this to anyone, but I was just so mad about the disrespect he was showing to my daughter that I was not thinking straight. At no point did Mario ever point the knife at my daughter, Lizeth. ***The knife was directed only at me and to repel my attack. My daughter was several feet away from him***.

> Mario is a good son-in-law who takes care of the two children he has with my daughter. I feel bad about what happened because I know that Mario should have never been charged with the two aggravated assault offenses which were filed against him. ***Upon reflecting on the matter, I feel that it is I was in large part to blame because it is I who instigated the fight which led to Mario's need to defend himself.***

[Emphasis added].

The final piece of new evidence Appellant relies upon is a recording and transcript of the 911 call Lizeth placed the night of the incident. The call begins with Lizeth telling the operator that her husband is bothering her. The operator asks Lizeth a few questions including her address, Appellant's age and race, followed by the following series of questions and answers:

Q. [by 911 operator]: What is . . . what color pants?

A. [by Lizeth Molina]: He has a knife.

Q. And what . . . what is he doing?

A. [sic] No! He has a knife! Please! It's the same . . .

Q. What is he doing to you?

A. [sic] Stop! Stop! (Unintelligible)

Q. Did he hit you ma'am?

A. No . . .

Q. (Unintelligible)

A. . . . but he is threatening my father with a knife.

Q. Where is your father?

A. Here with me.

Q. OK. He hasn't . . . does he still have the knife? Does he still have the knife?

A. No. I took it away from him.

Lizeth described the knife as a "small grey one" and informed the operator that Appellant left the premises in a black car.

### *Application and Analysis*

Even assuming that the evidence Appellant relies upon was "new," it does not unquestionably establish his innocence. At best it creates a conflict in the testimony which the trial court clearly reconciled against Appellant. We thus reject Appellant's argument that the affidavits comprise

the only credible evidence because it ignores Officer Almanza's testimony, the incident report, and the 911 transcript. Based on the written findings of fact, the trial court found the statements made by the Molinas to Officer Almanza credible and the statements in their January 2011 affidavits not credible. Because the record contains ample evidence supporting the findings, we perceive no abuse of discretion. We overrule Issues One and Two.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In Issues Three, Four, and Five, Appellant alleges that trial counsel rendered ineffective assistance by failing to investigate; failing to properly advise Appellant regarding a defense to the charges; and failing to properly advise Appellant regarding the immigration consequences of his plea.

### *Standard of Review*

A writ applicant who seeks habeas corpus relief based upon a claim he received ineffective assistance of counsel must demonstrate, by a preponderance of the evidence: (1) that his counsel's performance was deficient; and (2) that a reasonable probability exists that, but for counsel's alleged errors, the result of the proceeding would have been different. *See Padilla v. Kentucky*, 599 U.S. 356, 130 S.Ct. 1473, 1482, 176 L.Ed.2d 284 (2010); *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984); *Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex.Crim.App. 2005).

To establish deficient performance under the first prong, the applicant must demonstrate that counsel's representation fell below an objective standard of reasonableness as judged under prevailing professional norms. *Perez v. State*, 310 S.W.3d 890, 893 (Tex.Crim.App. 2010). In doing so, the applicant must overcome a strong presumption that counsel acted within the wide range of reasonable professional assistance, and we will not find counsel's performance deficient

- 14 -

unless the conduct is so outrageous that no competent attorney would have engaged in it. *Andrews v. State*, 159 S.W.3d 98, 101 (Tex.Crim.App. 2005), *citing Bone v. State*, 77 S.W.3d 828, 833 n.13 (Tex.Crim.App. 2002). An allegation that counsel rendered ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex.Crim.App. 1999).

To establish prejudice in the context of an involuntary guilty plea resulting from the ineffective assistance of counsel, the applicant must demonstrate that there is a reasonable probability that, but for his plea counsel's deficient representation, he would not have pleaded guilty but would have instead insisted on going to trial. *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985); *Ex parte Morrow*, 952 S.W.2d at 536. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2068. The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding in which the result is being challenged. *Id*., 466 U.S. at 697, 104 S.Ct. at 2070. To prevail in a habeas proceeding, the applicant must establish both elements of the *Strickland* test by a preponderance of the evidence. *See Ex parte Okere*, 56 S.W.3d 846, 856 (Tex.App.--Fort Worth 2001, pet. ref'd).

The right to effective assistance of counsel extends to a defendant at a guilty plea hearing. *Ex parte Martinez*, 330 S.W.3d 891, 900 (Tex.Crim.App. 2011), *cert. denied,* 131 S.Ct. 3073 (2011); *Ex parte Reedy*, 282 S.W.3d 492, 500 (Tex.Crim.App. 2009). "A decision to enter a guilty plea based upon erroneous advice from counsel is not voluntary." *Ex parte Hamad*, No. 05-11-01599-CR, 2012 WL 604029, at *4 (Tex.App.--Dallas Feb. 27, 2012, no pet.), *citing Ex parte Moussazadeh*, No. AP-76,439, 2012 WL 468518, at *3 (Tex.Crim.App. Feb. 15, 2012); *see Ex parte Burns*, 601 S.W.2d 370, 372 (Tex.Crim.App. 1980). The test for determining the

validity of a plea is whether the plea represents a voluntary and intelligent choice among alternative courses of action open to the defendant. *Hill*, 474 U.S. at 56, 106 S.Ct. at 369; *see also Kniatt,* 206 S.W.3d at 664 (explaining that "[t]o be voluntary, a guilty plea must be the expression of the defendant's own free will and must not be induced by threats, misrepresentations, or improper promises)(internal quotations omitted). "A defendant's sworn representation that his guilty plea is voluntary 'constitute[s] a formidable barrier in any subsequent collateral proceedings.'" *Kniatt*, 206 S.W.3d at 664 (internal quotations omitted).

A defendant challenging the voluntariness of his plea based on ineffective assistance bears the burden to prove that: (1) counsel's performance fell below a reasonable standard of competence; and (2) the defendant would, with a reasonable probability, have pled not guilty and insisted on going to trial had counsel not committed the alleged errors. *Ex parte Moody*, 991 S.W.2d 856, 857-58 (Tex.Crim.App. 1999).

### *Failure to Investigate*

In Issue Three, Appellant argues that his trial counsel rendered ineffective assistance because he failed to conduct an independent investigation of the facts. According to Appellant, had counsel properly investigated the facts of the case (*i.e*., listened to a recording of the 911 call and/or interviewed Lizeth and her father) then counsel would have realized that the hearsay statements in the incident report were inaccurate.

Under the first prong of *Strickland,* Appellant had the burden to demonstrate, by a preponderance of the evidence, that counsel's conduct fell below an objective standard of reasonableness. Here, the record includes an affidavit by trial counsel, Jeff Rago. According to the affidavit, Rago reviewed the State's evidence with Appellant, and Appellant did not dispute any of the facts. Appellant's own affidavit is silent on the issue, but Appellant denied this

assertion at the hearing. Although the evidence is conflicting, the trial court was the sole judge of witness credibility and specifically found that Rago's testimony was credible while Appellant's was not.

In conducting our review, we defer to the trial court's determination. Based on these facts, trial counsel could have reasonably concluded that it was not necessary to conduct his own independent investigation by independently interviewing the victims. He had no reason to believe the statements in the police report were anything but an accurate depiction of the incident. Accordingly, Appellant failed to meet his burden under the first prong of *Strickland* and therefore the trial court did not abuse its discretion in denying relief on this ground. We overrule Issue Three.

### *Failure to Advise Appellant that his Conduct was Justifiable*

In Issue Four, Appellant complains trial counsel rendered ineffective assistance for failing to advise him that his conduct toward his father-in-law was justifiable.

Under applicable Texas law, Appellant would be justified in making a threat of deadly force against his father-in-law: (1) if Appellant was justified in using force under Section 9.31 of the Texas Penal Code; and (2) when and to the degree Appellant reasonably believed deadly force was immediately necessary to protect himself against his father-in-law's use or attempted use of unlawful deadly force. *See* TEX.PEN.CODE ANN. § 9.32(a)(West 2011). "Reasonable belief means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX.PEN.CODE ANN. § 1.07(a)(42)(West Supp. 2012)(internal quotations omitted).

There is no credible evidence supporting Appellant's claim that he was justified in threatening Lizeth or her father with a deadly weapon. Trial counsel had no duty to inform

Appellant regarding a defense which was unsupported by the record. Since trial counsel's performance did not fall below an objective standard of reasonableness, we overrule Issue Four.

### *Failure to Advise Appellant Regarding the Immigration Consequences of his Plea*

Finally, Appellant contends that he was denied effective assistance under both *Strickland* and *Padilla v. Kentucky*, 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010) because trial counsel failed to properly inform his of the immigration consequences of his plea as required under *Padilla*.

In *Padilla*, the Supreme Court held that counsel's representation is constitutionally deficient if counsel fails to warn a noncitizen client of the certainty of removal when the terms of the relevant immigration statute are "succinct, clear, and explicit" in defining the removal consequences of a particular conviction. *Padilla*, 130 S.Ct. at 1483. "When the law is not succinct and straightforward . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Id*. Before relief may be granted, the petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances. *Id*. at 1485; *see also Hill*, 474 U.S. at 59, 106 S.Ct. at 370.

Pursuant to the plea agreement, Appellant received eight years' deferred adjudication. Had he proceeded to trial and been convicted, he would have been subject to a sentence of not less than two years and not more than twenty years. A guilty finding following trial would certainly have subjected Appellant to deportation. The only evidence that Appellant would not have pled guilty had he known about the nearly certain immigration consequences of his plea is Appellant's own affidavit which states in part:

> I also did not realize that my guilty plea to the two aggravated assault offenses in this cause resulted into aggravated felony convictions under the Immigration and

Nationality Act, as these guilty pleas are treated as a conviction for 'crime violence' under the I.N.A. Because I now realize there is no defense to a deportation or removal action when a person is convicted of an aggravated felony under the I.N.A., I never would have considered pleading guilty to these two felony offenses had attorney, Rago, explained to me the immigration consequences of these guilty pleas.

The trial court found that Appellant's self-serving statements were not credible, and we must defer to that finding. *See Amezquita*, 223 S.W.3d at 367 ("When the trial court's findings of fact in a habeas corpus proceeding are supported by the record, they should be accepted by this Court.").

Appellant did not carry his burden of establishing that he suffered prejudice. Accordingly, the trial court did not abuse its discretion by rejecting his claim for ineffective assistance of counsel on this ground. We overrule Issue Five and affirm the trial court's decision.

March 20, 2013

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.
Antcliff, J., not participating

(Do Not Publish)